DISTRICT COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. CROIX

| | |
|---|---|
| UNITED STATES OF AMERICA and ) | |
| PEOPLE OF THE VIRGIN ISLANDS, ) | |
| ) | |
| v. ) | |
| ) | Criminal Action No. 2012-010 |
| MISAEL LIMA, ) | |
| ) | |
| Defendant. ) | |
| _____ ) | |

**Attorneys:**
**Alphonso A. Andrews, Jr., Esq.,**
**Denise A. Hinds, Esq.,**
St. Croix, U.S.V.I.
  *For the Government*

**Yvette D. Ross-Edwards, Esq.,**
St. Croix, U.S.V.I.
  *For the Defendant*

## MEMORANDUM OPINION

**Lewis, District Judge**

THIS MATTER is before the Court on Defendant's Motion to Suppress, filed on June 12, 2012, and Defendant's Motion to Dismiss Indictment, filed on June 26, 2012. (Dkt. Nos. 16 & 26). The Government filed its Opposition to the Motion to Suppress on June 19, 2012, and its Opposition to the Motion to Dismiss on July 27, 2012. (Dkt. Nos. 24 & 33). An evidentiary hearing on these matters was held on August 2, 2012. For the reasons discussed below, the Court will deny Defendant's Motions.

## I. BACKGROUND[1]

Defendant Misael Lima ("Defendant" or "Lima") was arrested on January 21, 2012 and charged with unauthorized possession of a firearm. An information was filed on February 17, 2012 charging him with the crimes of felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g) and 924(a)(2) (Count 1), and unauthorized possession of a firearm, in violation of 14 V.I.C. § 2253(a) (Count 2). On May 15, 2012, Defendant was indicted on the same two counts. (Dkt. No. 1).

At the August 2, 2012 suppression hearing, three Virgin Islands Police Department ("VIPD") officers testified. Officer Dirk Marshal stated that, between approximately 7:00-8:00 p.m. on January 21, 2012, he was driving a marked police car with the windows down, and his partner, Officer Omar Henry, was in the passenger seat. Officer Marshal's car was part of a three or four-car routine patrol in the Williams Delight housing community. (Transcript at 7, 8, 30, Dkt. No. 56). The convoy was proceeding to an area in the housing community known as "the turf," where the officers knew that individuals would congregate to gamble, sell illegal drugs, and engage in other illegal activities. Officer Marshal had previously made seizures of marijuana there. *Id.* at 9.

Approximately 200 feet from the turf—a distance of two or three houses—the convoy passed a white vehicle parked by the side of the road. Officer Marshal saw three men hovering near the trunk of the car, with one of the men sitting in the open trunk. Officer Marshal smelled a

---

[1]   The Court bases the background factual discussion in this section on the record established at the suppression hearing. The Court provides this information solely for the purposes of this pretrial motion, ever mindful that Defendant is presumed innocent until proven guilty. Most of the facts discussed herein are alleged, but at this stage not conceded or proven beyond a reasonable doubt to the factfinder.

strong scent of marijuana smoke. *Id.* at 8-10. He stopped his car, and he and his partner exited the vehicle and approached the men. *Id.* at 10-11. As Officer Marshal drew near, he observed the man who had been sitting in the trunk—Defendant Lima—"pop" out, which Officer Marshal interpreted as a nervous action. Officer Marshal asked the men if they were smoking marijuana. *Id.* at 10, 31, 33. A man who Officer Marshal identified as the operator of the vehicle answered affirmatively, stating that they had just been "working on the taillights and just finished smoking some weed." *Id.* at 11. Officer Marshal asked the operator to come closer so he could speak with him. *Id.* at 12. He suspected the commission of a crime—possession of marijuana. *Id.* at 18, 19. Officer Marshal described the conversation with the operator as "normal"—there was no hostility. *Id.* at 43.

Within seconds—no more than a minute—other officers from the patrol arrived on the scene. *Id.* at 34. Officer Marshal testified that five officers, including himself, were in the immediate area. *Id.* at 17. As the other officers approached Lima, one of them asked him if he had smoked marijuana. *Id.* at 14. Officer Marshal observed Lima begin to fidget and touch his side. When an officer asked why Lima was acting so nervously, Lima started running. *Id.* at 14, 15. Officer Marshal estimated that approximately three minutes had passed from the time of the initial encounter to the point when Lima took off running. *Id.* at 44.

Officers Marshall and Henry and Sgt. Walter Jack pursued him. *Id.* at 19. Officer Marshal trained a flashlight on Defendant Lima while giving chase. *Id.* at 21-22. He observed Lima hold the waistband of his pants and pull out a firearm. Sgt. Jack yelled "Gun! Gun! Gun!" to alert the officers of the existence of a firearm. *Id.* at 20. After running a bit further, Officer Marshal observed Defendant make an overhand toss, throwing the firearm over a chain link fence into a yard. *Id.* at 21. Officer Marshal ordered Lima to stop running or he would be tased. *Id.* at 22.

Lima continued running until he arrived at one of the apartments in the area, and attempted to enter. Officer Marshal deployed the taser in order to apprehend Lima. *Id.* at 23-25.

Officer Marshal stated that, when Defendant tossed the firearm, he was aware that Lima had committed the offense of unauthorized possession of a firearm because he knew that Defendant was a convicted felon who was not lawfully able to possess a firearm. *Id.* at 43, 45. He asserted that Lima had also disobeyed a lawful order because he refused to stop running when Marshal ordered him to stop. *Id.* at 42.

Sgt. Jack, an eighteen-year veteran of the VIPD, testified that, when he arrived at the area where the officers were talking with three individuals, the conversation was "calm, relaxed, regular." *Id.* at 52. He heard one of the officers tell Lima to relax. At that moment, Defendant started running. *Id.* at 54. Sgt. Jack ran after him. Almost immediately, he saw Defendant pull out a firearm from his waist area. *Id.* at 55. Sgt. Jack shouted "Gun. Gun." and ordered Defendant: "Stop. Police. Drop—drop the gun." *Id.* at 55, 65. During the chase, Sgt. Jack saw Lima throw his weapon away. *Id.* at 66. Once Lima was apprehended, Sgt. Jack returned to the area where Lima had tossed the weapon and recovered it. *Id.* at 70. Sgt. Jack also knew that Lima had been arrested previously for gun charges and was not authorized to carry a weapon as a convicted felon. *Id.* at 68-69.

Officer Henry testified that he smelled the odor of marijuana when the vehicle in which he and Officer Marshall were riding passed three males at the rear of a white Toyota Yaris with the trunk of the car up. *Id.* at 73, 74. He and Officer Marshall stopped to investigate. As Officer Henry approached the men, he stated he smelled marijuana and asked what was going on. *Id.* at 74. He also asked Defendant, who was sitting in the trunk of the car, to step toward him. Defendant "responded"—he stood up and stepped toward him. *Id.* at 75. He observed that Lima

4

was fidgeting on the right side of his body. Officer Henry thought that Lima was trying to hide marijuana or drugs and therefore looked in the trunk, but did not find anything. *Id.* at 76. At this point, other officers were speaking with Lima, who stepped away from them and appeared to be nervous. *Id.* When an officer asked Defendant why he was so nervous, Lima took off running. *Id.* at 76. Officer Henry joined the chase, which ended with Lima's apprehension. *Id.* at 77-79.

## II. DISCUSSION

### A. The Motion to Suppress

Defendant Lima argues that the firearm should be suppressed because he submitted to the authority of the officers when he stepped forward in response to the officers' request to do so and was therefore "seized" within the meaning of the Fourth Amendment. According to Defendant, because the officers had not witnessed anyone smoking marijuana and had not found anything in the trunk, they had no reason to detain him further. Consequently his continued seizure—the time between when the search of the trunk concluded and when Lima took off running—was unreasonable and unconstitutional, and the gun must be suppressed. He also argues that when he discarded the weapon during the chase, he was under the control of the police officers because he was within the range of their tasers.[2]

The Government focuses on the events that occurred during the approximately three minutes between when the officers approached the men and when Lima took off running. It asserts that the officers had reasonable suspicion to question the men, based on the smell of marijuana, and to engage in an investigative *Terry* stop; the three-minute interaction was

---

[2] When pressed by the Court, defense counsel stated that she had no legal authority for the proposition that if an individual is within the range of an officer's taser, (s)he is under the control of the officer. Counsel acknowledged that to so conclude would require the Court to break new jurisprudential ground. The Court declines counsel's invitation, and rejects this argument.

reasonable; and there was no constitutional violation resulting from this encounter. The Government further argues that during the chase, Lima abandoned the firearm, at which time there was probable cause to arrest him because the officers knew he was a felon in possession of a firearm.

### 1. Applicable Legal Principles

The Fourth Amendment protects individuals from "unreasonable searches and seizures," U.S. Const. amend. IV, and "searches without a warrant are presumptively unreasonable." *United States v. Mathurin*, 561 F.3d 170, 173 (3d Cir. 2009). "However, under the exception to the warrant requirement established in *Terry v. Ohio*, 392 U.S. 1 (1968), the Supreme Court has held that 'police can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot,' even if the officer lacks probable cause.'" *Id*. at 173-74 (quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989)). Such brief investigative stops are "seizures" subject to Fourth Amendment protection. *Johnson v. Campbell*, 332 F.3d 199, 205 (3d Cir. 2003) (citing *Terry*, 392 U.S. at 21).

Reasonable suspicion "is a less demanding standard than probable cause[.]" *Alabama v. White,* 496 U.S. 325, 330 (1990). Because "probable cause means 'a fair probability that contraband or evidence of a crime will be found,' the level of suspicion necessary to justify a *Terry* stop is somewhat lower and can be established with information that is different in quantity or content than that required for probable cause." *United States v. Ramos*, 443 F.3d 304, 308 (3d Cir. 2006) (quoting *White*, 496 U.S. at 330 and citing *Illinois v. Gates,* 462 U.S. 213, 238 (1983)). The police officer must, however, demonstrate that the stop was based on something more than an "'inchoate and unparticularized suspicion or hunch.'" *Sokolow,* 490 U.S. at 7 (quoting *Terry,* 392 U.S. at 27). An officer, therefore, "may only effectuate a *Terry* stop

6

where 'specific and articulable facts, together with all their rational inferences, suggest that the suspect was involved in criminal activity.'" *Ramos*, 443 F.3d at 308 (quoting *United States v. Robertson,* 305 F.3d 164, 168 (3d Cir. 2002)).

In evaluating reasonable suspicion, courts "must consider 'the totality of the circumstances—the whole picture.'" *Sokolow*, 490 U.S. at 8 (quoting *United States v. Cortez*, 449 U.S. 411, 417 (1981)). Relevant factors include, but are not limited to: (1) presence of a suspect in a high crime area; (2) a suspect's "nervous, evasive behavior" or flight from police; and (3) a suspect's behavior that conforms to police officers' specialized knowledge of criminal activity. *United States v. Brown*, 448 F.3d 239, 251 (3d Cir. 2006) (quoting *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) (citing cases). What is constitutionally "unreasonable" varies with the circumstances, and requires a balancing of the "nature and extent of the governmental interests" that justify the seizure, against the "nature and quality of the intrusion on individual rights" that the seizure imposes. *Terry,* 392 U.S. at 22, 24. In judging the reasonableness of stops, courts examine whether "the facts available to the officer at the moment of the seizure . . . 'warrant a man of reasonable caution in the belief'" that "criminal activity may be afoot." *Id.* at 21–22, 30 (citations omitted).

> The constitutionality of a *Terry* stop involves a two-part assessment:
>
> First, we examine 'whether the officer's action was justified at its inception'— that is, whether the stop was supported by reasonable suspicion at the outset. . . . Next, we determine whether the manner in which the stop was conducted 'was reasonably related in scope to the circumstances which justified the interference in the first place.'

*United States v. Johnson*, 592 F.3d 442, 452 (3d Cir. 2010) (quoting *Terry*, 392 U.S. at 19-20). In considering whether a stop is "'so minimally intrusive as to be justifiable on reasonable suspicion,'" courts consider the duration of the stop; the law enforcement purposes justifying the

7

stop; whether the police diligently sought to carry out those purposes given the circumstances; and alternative means by which the police could have served their purposes. *United States v. Sharpe,* 470 U.S. 675, 684-87 (1985) (citation omitted). Finally, any evidence obtained as a result of an unconstitutional seizure "must be suppressed as 'fruit of the poisonous tree.'" *Brown*, 448 F.3d at 244 (quoting *Wong Sun v. United States*, 371 U.S. 471, 487-88 (1963)).

### 2. Reasonable Suspicion

The parties dispute whether the events surrounding the initial encounter between the VIPD and Defendant constitute a seizure that implicates the Fourth Amendment. Assuming for purposes of this analysis that such a seizure took place, it passes muster under the Fourth Amendment because the officers had reasonable, particularized suspicion that Lima was involved in criminal activity, *United States v. Goodrich,* 450 F.3d 553, 561 (3d Cir. 2006), and they possessed "'some minimal level of objective justification'" necessary for the *Terry* stop. *Sokolow*, 490 U.S. at 7 (citation omitted).

The Government has shown that the officers had reasonable suspicion to initiate the *Terry* stop. First, Officer Marshal testified that the encounter with the men took place approximately 200 feet—a distance of two or three houses—from "the turf," known to him and Sgt. Jack as a place where people smoked marijuana, gambled, and engaged in illegal activities, including selling drugs. It was a place, according to Officer Marshal, where he had previously made drug seizures. While an individual's presence in an "area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime," a location's characteristics are relevant in "determining whether the circumstances are sufficiently suspicious to warrant further investigation." *Wardlow*, 528 U.S. at 124.

Second, Officer Marshal smelled "a strong scent . . . of marijuana smoke" through the open window of his patrol car when they drove past the three men. (Tr. at 10, Dkt. No. 56). Officer Henry testified that he also smelled marijuana as he approached the three men. *Id.* at 74. Further, the operator of the car admitted to Officer Marshal that they had been smoking marijuana. *Id.* at 11. Having smelled a strong odor of marijuana emanating from the place where the three men were standing, it was reasonable for Officers Marshal and Henry to suspect criminal activity. The source of the odor was sufficiently particularized to the three men. In such a circumstance, "under *Terry* and its progeny, the officers had reasonable suspicion and were entitled to investigate further[.]" *Ramos,* 443 F.3d at 309; *see id.* at 308 ("It is well settled that the smell of marijuana alone, if articulable and particularized, may establish not merely reasonable suspicion, but probable cause.") (citing *United States v. Humphries,* 372 F.3d 653, 658 (4th Cir. 2004) and *United States v. Winters,* 221 F.3d 1039, 1042 (8th Cir. 2000)); *see also United States v. Walters,* 2008 WL 3098493, at *3 (D.V.I. Aug. 1, 2008) ("On arrival at the scene, the officers perceived the odor of what they believed to be marijuana. That perception, based on the officers' knowledge and experience, provided additional support for the officers' reasonable suspicion that criminal activity was afoot.") (citing cases where police officers smelling marijuana sufficed to form reasonable suspicion necessary to justify *Terry* stop). Considering the totality of the circumstances, the officers' decision to approach the men and investigate further was "justified at its inception." *Terry*, 392 U.S. at 20.

Lima attempts to parse the events of the approximately three-minute encounter into those that were purportedly constitutionally permissible, and those that purportedly were not. He establishes a line of demarcation at the point when the officers did not see anyone smoking marijuana and did not find any illegal drugs in the trunk. In Lima's view, because the officers

9

had found no evidence that he had any involvement in any crime once the trunk was searched, they had no further reason to detain him and should have told him he was free to leave.[3] Therefore, according to Lima, what occurred afterwards—Lima's fidgeting, stepping backwards, running away, and discarding of the gun—occurred without reasonable suspicion, in the context of an unconstitutional search and seizure. Thus, Lima contends that the firearm must be suppressed as the fruit of that unconstitutional seizure.

This argument—essentially that the *Terry* stop violated Lima's Fourth Amendment rights because it was unnecessarily prolonged—implicates the second inquiry of the *Terry* analysis: whether the stop was "excessively intrusive in its scope or manner of execution." *Johnson*, 592 F.3d at 451. The Court must review the manner in which the VIPD officers conducted the *Terry* stop at issue here to determine whether it was reasonably related in scope to the initial justification for the stop. *See id.* at 452.

For the Court to enforce such an arbitrary and artificial end to a brief investigatory encounter that had just begun, as urged by Defendant Lima, and which suffered from no Fourth Amendment infirmity at its inception, would prevent the officers from doing their job—to assess the circumstances in light of their knowledge and experience and determine whether and how they should continue their investigation. The brevity of the *Terry* stop and the minimally intrusive nature of the investigation confirms that the officers "diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly . . . ." *Sharpe*, 470 U.S. at 686. The approximately three minute interaction between the police officers and the three men fits entirely within *Terry*'s admonition that an investigatory stop be brief. *Cf. United States v.*

---

[3] The encounter by the side of the road lasted a total of approximately three minutes. Other officers from the convoy arrived about a minute after the encounter began. None of the officers estimated how far into the incident the search of the trunk occurred.

*Frost*, 999 F.2d 737, 740-42 (3d Cir. 1993) (holding that a seizure lasting eighty minutes was acceptable under the circumstances, where the police had acted diligently). Defendant's attempt to parse an already brief and entirely legitimate investigatory stop into even smaller segments defines rationality.

Even if the Court were to accept Defendant's premise—which it does not—that the end of the trunk search should have marked the end of reasonable suspicion and the end of the investigation, there would not have been time to establish such a line of constitutional demarcation because Lima's behavior that immediately followed provided additional grounds for reasonable suspicion. At the conclusion of the trunk search, the officers' attention was drawn to Lima, who was acting nervously—stepping backwards and fidgeting. The Supreme Court has "recognized that nervous, evasive behavior is a pertinent factor in determining reasonable suspicion." *Wardlow*, 528 U.S. at 124; *see also United States v. Givan*, 320 F.3d 452, 459 (3d Cir. 2003) (finding facts that defendant "appeared nervous and fidgety and was talking often and shuffling his feet" contributed to reasonable suspicion); *United States v. Moorefield*, 111 F.3d 10, 14 (3d Cir. 1997) (finding that defendant's "furtive hand movements" formed partial basis for reasonable suspicion).

Immediately thereafter, Lima engaged in headlong flight, which the Supreme Court has described as "the consummate act of evasion: It is not necessarily indicative of wrongdoing, but it is certainly suggestive of such." *Wardlow,* 528 U.S. at 124. Officers confronted by the flight of a person under investigation during a *Terry* stop must be allowed "to stop the fugitive and investigate further." *Id.* at 125*; see also United States v. Edwards*, 53 F.3d 616, 619-20 (3d Cir. 1995) (observing that "in neither a [*Terry*] stop nor an arrest is a suspect free to leave. . . . Clearly, a *Terry* stop is a seizure, and one seized is by definition not free to leave.").

11

Thus, the Defendant *himself* extended the *Terry* stop in that he provided the officers with additional grounds for reasonable suspicion that criminal activity was afoot by nervously fidgeting and then engaging in headlong flight. The officers could logically conclude that Lima possessed marijuana and was attempting to avoid detection. As a result, the officers' chase, as an extension of the *Terry* stop, was related to the justification for the stop in the first instance. Here, the "*suspect's actions [in attempting to elude the police] contribute[d] to the added delay about which he complains.*" *Sharpe*, 470 U.S. at 688 (emphasis added); *see also United States v. Polanco*, 2007 WL 218727, at *5 (D.V.I. Jan. 29, 2007) (remarking that "a suspect's unprovoked flight during a lawful *Terry* stop may form part of the basis for probable cause to extend the scope of a stop to an arrest.") (citing *Sibron v. New York*, 392 U.S. 40, 66 (1968)). The Court therefore finds that Lima's actions extended the reasonable suspicion that supported the officers' initial detention of Lima and lasted through the chase. Consequently, there was no Fourth Amendment infirmity at the point that Lima tossed the gun.

Finally, the reasonable suspicion of the ongoing *Terry* stop ripened into probable cause to arrest Lima on two grounds. First, where reasonable suspicion had been established and Lima fled, that is sufficient to support a finding of probable cause. *See United States v. Laville,* 480 F.3d 187, 195 (3d Cir. 2007) ("It is 'well established that where police officers reasonably suspect that an individual may be engaged in criminal activity, and the individual deliberately takes flight when the officers attempt to stop and question him, the officers generally no longer have mere reasonable suspicion, but probable cause to arrest.'") (quoting *Sharpe,* 470 U.S. at 705) (Brennan, J., dissenting)). Second, Officers Marshall and Sgt. Jack had personal knowledge, based on their previous encounters with and knowledge of Lima, that he was a convicted felon who, by law, was not authorized to possess a firearm. (Tr. at 43, 45, 68-69, Dkt. No. 56). During

the chase, when they observed that Lima possessed a gun, that fact provided probable cause to arrest him. *See United States v. Goode*, 309 F. App'x 651, 654 (3d Cir. 2009) ("When reasonable suspicion surrounding a suspect ripens into probable cause during the course of an investigatory stop, arrest of that suspect is lawful."). The presence of probable cause to arrest provides a further reason why the retrieval of the gun did not violate Lima's Fourth Amendment rights.[4]

In view of the foregoing, Lima's Fourth Amendment challenge to any aspect of the *Terry* stop and his arrest must fail. The Court will deny Lima's motion to suppress.

### B. The Motion to Dismiss

Lima has also moved to dismiss his indictment on the ground that, because his detention and arrest were unconstitutional, any charges stemming from the arrest should be dismissed. (Dkt. No. 26). During the suppression hearing, defense counsel acknowledged that the motion to dismiss depended on the outcome of the motion to suppress: if the gun was suppressed, there would be no basis upon which the Government could proceed on the charges of felon in possession of a firearm and unauthorized possession of a firearm. Conversely, if the Court denied the motion to suppress, the motion to dismiss must also be denied. In view of the Court's

---

[4] Defense counsel argues that there was no evidence showing that Lima was not authorized to possess a firearm, and that the officers should have checked to see whether he had a prior felony conviction, apparently prior to arresting him. Counsel does not explain why the officers' personal knowledge that Lima was a convicted felon is not sufficient for a showing of probable cause. *See United States v. McGlory,* 968 F.2d 309, 342 (3d Cir. 1992) ("Probable cause exists where the facts and circumstances within the arresting officer's knowledge are sufficient to warrant a reasonable person to believe an offense had been committed [by the suspect in question]."); *United States v. Russell,* 2011 WL 1603379, at *4 (E.D. Pa. Apr. 27, 2011) ("The facts available to [the police officer] at the time he observed the gun were such that there was probable cause to believe that the gun was evidence that a known convicted felon, namely [defendant] was illegally in possession of a firearm. [The officer] knew that [defendant] was a convicted felon. . . .").

conclusion that no Fourth Amendment violation occurred and thus the gun will not be suppressed, Defendant's Motion to Dismiss the Indictment will be denied.

### III.   CONCLUSION

For the reasons stated above, the Court denies Defendant's Motion to Suppress. (Dkt. No. 16). The Court also denies Defendant's Motion to Dismiss the Indictment. (Dkt. No. 26). An appropriate order accompanies this Memorandum Opinion.

Date: September 25, 2012                             _____/s/_____
                                                     WILMA A. LEWIS
                                                     District Judge